Cite as 2022 Ark. App. 163

# ARKANSAS COURT OF APPEALS
## DIVISION II
No. CR-21-502

| | |
|---|---|
| JEFFERY KEITH ARMER<br><br>APPELLANT<br><br>V.<br><br>STATE OF ARKANSAS<br><br>APPELLEE | Opinion Delivered April 13, 2022<br><br>APPEAL FROM THE BOONE COUNTY CIRCUIT COURT [NO. 05CR-20-327]<br><br>HONORABLE JOHN R. PUTMAN, JUDGE<br><br>AFFIRMED |

**STEPHANIE POTTER BARRETT, Judge**

Jeffery Armer was convicted by a Boone County jury of simultaneous possession of drugs and firearms, possession of methamphetamine, and two counts of possession of drug paraphernalia—one count for having paraphernalia to ingest controlled substances and one count for having paraphernalia used to pack or repack controlled substances. He was sentenced as a habitual offender to a total of ninety-eight years in prison. On appeal, Armer argues that the circuit court erred in denying his motions for directed verdict. We affirm.

At trial, Officer Jeffery Baumgardner testified that he was assisting Investigator Gene Atwell of the Boone County Sheriff's Department on October 26, 2020, in the investigation of the theft of two firearms from a vehicle in the summer of 2020 at Beaver Lake, and leads were developed that led them to Armer's residence. According to Baumgardner, when they arrived at Armer's house, Armer's son answered the door and invited them inside when they

asked if Armer was home. Armer came out of his bedroom into the living room, and the officers began a conversation with him. Armer unexpectedly turned and walked back into his bedroom during this conversation with the officers, who followed Armer into the bedroom and continued the conversation. Baumgardner expected Armer to sit on the bed, but instead, Armer walked to the far side of the bed, sat directly on a green pillow, and placed his right hand under the pillow. Baumgardner testified that Armer's actions caused him to be concerned for officer safety, and when he asked Armer if he had anything illegal, Armer said yes. As Armer stood up, the officers saw a firearm, which was later determined to be loaded, under the pillow Armer had been sitting on, and Armer had his hand on the weapon. The officers removed the gun from Armer's possession, and he was placed in restraints and removed from the bedroom by Baumgardner.

Investigator Atwell's testimony regarding the events leading up to the discovery of the loaded gun echoed Baumgardner's testimony. After Baumgardner removed Armer from the bedroom, Atwell cleared the loaded gun and searched the area where Armer had been to ensure there were no more weapons. Atwell searched the area where the firearm had been found; in a closet approximately three feet from the bed, he found a dresser with the drawers open, and in the top drawer he found baggies, syringes, pocketknives, a set of scales, pipes used for ingesting narcotics, and methamphetamine. The rock-like substance found in the dresser drawer in Armer's bedroom was determined by a forensic drug chemist at the Arkansas State Crime Laboratory to be 1.4883 grams of methamphetamine.

Michael Tramell, a criminal investigator with the Boone County Sheriff's Office, interviewed Armer at the sheriff's office on October 26. The interview was videotaped, and a copy of the video was entered into evidence and played for the jury. In the interview, Armer admitted to Tramell that he had borrowed a pistol from someone in Huntsville to scare people who had been stealing his belongings, but he denied knowing the gun was stolen. Armer said that he thought his son had let the officers into the house, that he only realized the officers were there when he walked into the living room, and that when they all three went into the bedroom from the living room, he sat down on the bed and tried to cover the gun. Armer denied that he was trying to hurt anyone, he just did not want the officers to see the gun because he did not want to get caught with it in his possession. When Tramell questioned Armer about the methamphetamine found in the house, Armer told him, "[H]onestly, I thought I'd cleaned everything out when my wife came around . . . . I'm trying to clean up, you know what I mean?" When asked how long he had had the methamphetamine, Armer told Tramell it had to have been "a couple of weeks anyway." When Tramell asked Armer if there was probably some drugs or paraphernalia in his house, Armer stated, "I mean, there could have been, yes," and he admitted that he wanted his wife to believe that he was "getting cleaned up." However, Armer claimed that he did not know there was methamphetamine in the bedroom, stating that he had flushed "quite a bit" before he had previously come to the sheriff's office to speak with Tramell. When Tramell asked when he had last sold meth, Armer said it had been maybe a month earlier. He told Tramell that he just did it "to keep [him]self high" and that it had been three or four days since he

had last used meth. Armer told Tramell that he honestly did not know the meth was in the house, that he was excited about trying to get his family back, and that maybe he had overlooked the meth. Investigator Atwell also questioned Armer about the meth found in the dresser drawer in his bedroom during the taped interview. Armer told Atwell that it should not have been there and that he thought he had thrown everything out because he was "trying to do right."

The State rested its case in chief after Trammell's testimony. Armer moved for directed verdicts on all charges against him. With regard to possession of methamphetamine, Armer argued that the State had to prove that he knowingly possessed methamphetamine, and it failed to do so because the methamphetamine was found in a room Armer shared with another person, and he was not in exclusive control of the methamphetamine.[1] Armer argued that during his interview, he stated that he was not even aware there was methamphetamine in the house. The State countered that Armer constructively possessed the methamphetamine. Armer also argued that even though he possessed the firearm, because the State failed to prove he possessed the methamphetamine, the charge of simultaneous possession of drugs and firearms must also fail. The State again contended that the jury could find that Armer constructively possessed the methamphetamine. As to the two counts of possession of drug paraphernalia, Armer argued that the State failed to show that he knowingly possessed paraphernalia with the purpose "to use drug paraphernalia

---

[1]Although Armer made a joint-possession argument below, he has abandoned that argument on appeal.

to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, re-pack, store, contain, or conceal a controlled substance that is methamphetamine or cocaine" or that he possessed any paraphernalia "with the purpose to use, to inject, ingest, inhale or otherwise introduce into the human body a controlled substance." Armer's motions were denied.

Armer rested without calling any witnesses. He renewed his motions for directed verdict, which were again denied. The jury returned guilty verdicts for simultaneous possession of drugs and firearms, possession of methamphetamine, and the two counts of possession of drug paraphernalia.

A motion for directed verdict at a jury trial is a challenge to the sufficiency of the evidence. *Baker v. State*, 2019 Ark. App. 515, 588 S.W.3d 844. In reviewing a challenge to the sufficiency of the evidence, this court determines whether the verdict is supported by substantial evidence, which is evidence that is forceful enough to compel a conclusion one way or the other beyond speculation or conjecture. *Id.* The evidence is viewed in the light most favorable to the verdict, and only evidence supporting the verdict will be considered. *Id.* Circumstantial evidence may provide a basis to support a conviction if it is consistent with the defendant's guilt and inconsistent with any other reasonable conclusion. *Id.* Whether evidence excludes every other hypothesis is left to the jury to decide. *Id.* The credibility of witnesses is an issue for the jury and not the court. *Id.* The trier of fact is free to believe all or part of any witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence. *Id.*

Armer's arguments all center on his claim that he did not know the methamphetamine and drug paraphernalia were in his house. He contends that the State offered no evidence that he knew about the methamphetamine and drug paraphernalia, only evidence of constructive possession, and that knowledge and possession are two separate elements that must be proved by direct or circumstantial evidence.

When possession of contraband is an element of the offense, the State is not required to prove literal physical possession—constructive possession is sufficient. *Braswell v. State*, 2022 Ark. App. 102. Constructive possession can be implied when the contraband was found in a place immediately and exclusively accessible to the accused and subject to his control. *Id.* To prove constructive possession, the State must establish that the defendant exercised care, control, and management over the contraband. *Id.* The defendant's control over, and knowledge of, the contraband can be inferred from the circumstances, such as the proximity of the contraband to the accused, the fact that it is in plain view, the ownership of the property where the contraband is found, and the accused's suspicious behavior. *Id.*

Armer cites *Garner v. State*, 2020 Ark. App. 101, 594 S.W.3d 145, in support of his argument that the State failed to prove he had knowledge of the methamphetamine and drug paraphernalia. *Garner* is distinguishable in several respects. First, *Garner* involved a jointly occupied dwelling, and the contraband was found in a bedroom that was not designated as Garner's bedroom. There is no argument made on appeal in the present case that the premises (Armer's bedroom where the drugs and paraphernalia were found) was jointly occupied. Armer acted strangely when interacting with the officers, leaving the living

6

room in the middle of a conversation to return to his bedroom and sit on a pillow in an attempt to hide the gun. Unlike the circumstances in *Garner*, the drugs and paraphernalia in the present case were found in an open dresser drawer in a closet approximately three feet from where Armer had been sitting on the bed. And although Armer claimed not to have known that the methamphetamine and paraphernalia were in the house, he stated in his taped interview that he thought he had cleaned everything out, that he had had the methamphetamine for a couple of weeks, that it had been about a month since he had sold any methamphetamine, that he sold it just to keep himself high, and that he had last used meth three or four days before. Armer admitted there could have been some drugs and paraphernalia in the house that he had overlooked, but he thought he had thrown everything out because he was "trying to do right." Viewing the evidence in the light most favorable to the State, Armer's knowledge of, and control over, the contraband found in his residence can be inferred under these circumstances. The jury, as the finder of fact, was not required to believe Armer's assertion that he did not know the methamphetamine and drug paraphernalia were in his house.

Armer also argues that his conviction for simultaneous possession of drugs and firearms cannot stand if his conviction for possession of methamphetamine is reversed. Because we affirm the conviction for possession of methamphetamine, Armer's conviction for simultaneous possession of drugs and firearms is also affirmed because Armer makes no argument that he did not possess the firearm.

Affirmed.

HARRISON, C.J., and WHITEAKER, J., agree.

*Tara Ann Schmutzler*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Walker K. Hawkins*, Ass't Att'y Gen., for appellee.